IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

FEDERAL DEPOSIT INSURANCE          )
CORPORATION as Receiver for        )
MCINTOSH COMMERCIAL BANK,          )
                                   )
    Plaintiff,                     )          CIVIL ACTION FILE NO.:
                                   )
    v.                             )          3:14-cv-33-TCB
                                   )          _____
JOHN H. BURSON, III, M.D.,         )
LAWRENCE M. ALLIGOOD, M.D.,        )
RONNIE H. JORDAN,                  )
ROBERT B. PITTS, M.D.,             )
DENE M. SCHOERNER,                 )          JURY TRIAL DEMANDED
WILLIAM H. GAFFORD, JR.,           )
MARVIN KENNEDY, and JAN P. TEAL,   )
                                   )
    Defendants.                    )

## COMPLAINT

Plaintiff Federal Deposit Insurance Corporation ("FDIC") as Receiver

("FDIC-R") for McIntosh Commercial Bank ("McIntosh" or "Bank"), hereby files

its Complaint against John H. Burson, III, M.D. ("Burson"), Lawrence M. Alligood,

M.D. ("Alligood"), Ronnie H. Jordan ("Jordan"), Robert B. Pitts, M.D. ("Pitts"),

Dene M. Schoerner ("Schoerner"), William H. Gafford, Jr. ("Gafford"), Marvin

Kennedy ("Kennedy"), and Jan P. Teal ("Teal") (Burson, Alligood, Jordan, Pitts,

Schoerner, Gafford, Kennedy and Teal are collectively referred to herein as the

"Defendants") for negligence, gross negligence, and breach of fiduciary duty, showing the Court the following:

## I. INTRODUCTION

1.      FDIC-R brings this lawsuit in its capacity as Receiver for the Bank, a failed financial institution.

2.      This action is brought against Defendants, eight of the Bank's former officers and/or directors for negligence, gross negligence, and breach of fiduciary duty in their approval of loans made by the Bank. The FDIC seeks to recover as compensatory damages at least $12.03 million caused by Defendants' tortious conduct (the "Damages") in connection with commercial real estate loans approved by Defendants between March 21, 2006, and June 19, 2007 (collectively, the "Loss Transactions"), as alleged more particularly below, all of which took place prior to the failure of the Bank.

3.      As officers and directors, Defendants had the duty to safeguard McIntosh's financial condition, make informed, good faith decisions, and ensure safe and sound banking practices, including operating and managing the lending function of the Bank.  Defendants were obligated to comply and ensure compliance with banking laws, regulations and supervisory guidance.

4.     Each of the Defendants either recommended loans for approval by, or served as members of, the Bank's Executive Loan Committee (the "Loan Committee") and, in that capacity, had direct responsibility for the approval of loans.

5.     Among other things, Defendants:

(a)  improperly extended credit to borrowers who were not creditworthy;

(b) extended credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information, resulting in loans advanced to borrowers with no apparent ability to repay or otherwise service the loans;

(c) knowingly approved loans and loan participations which violated McIntosh's loan policies (referred to cumulatively as the "Loan Policy") and applicable federal and state regulations, including loans which they knew would exceed the Bank's and regulatory limits on the amount that could be loaned as a percentage of the value of the collateral securing the loan ("loan-to-value" or "LTV" ratios) if fully funded, thereby failing to exercise that degree of care that every person

of common sense, however inattentive that person may be, exercises under the same or similar circumstances;

(d) knowingly originated, recommended, and/or approved loans in which appraisals on loan collateral were either not performed or failed to meet the requirements of the Uniform Standards of Professional Appraisal Practice ("USPAP") or of state law and regulations, thereby failing to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances;

(e) knowingly permitted poor underwriting in contravention of the Bank's policies, applicable rules and regulations, supervisory direction and guidance, and reasonable industry standards;

(f) recommended and/or approved loans that they knew or had reason to know were improperly underwritten and/or imprudent, including origination and/or renewal of loans in which the borrowers lacked the demonstrated ability to repay, collateral was inadequate, and/or collectability was not reasonably assured;

(g) allowed and encouraged excessive and irresponsible concentrations of commercial real estate ("CRE") and acquisition, development and construction ("ADC") loans; and

(h) recommended, originated, and approved CRE loans, including ADC loans, despite high-risk overconcentrations of such loans on the Bank's balance sheet, demonstrable deterioration in the Bank's existing CRE and ADC loan portfolios, and known adverse economic and market conditions.

6.      The FDIC-R seeks recovery of damages caused by Defendants' negligence, gross negligence, and breaches of fiduciary duty in violating the Bank's policies in their approval of loans. In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from the Defendants' negligence, gross negligence, and breaches of fiduciary duty.

7.      The actions and inactions of Defendants were the direct and proximate cause of the Damages the FDIC-R now seeks to recover.

## II. JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction of this matter because actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12

U.S.C. § 1811, *et seq.;* 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345. The FDIC has the power to bring suit in any court of law. 12 U.S.C. § 1819.

9.     This Court has personal jurisdiction over Defendants who at all relevant times were residents of and/or conducted the Bank's business in the State of Georgia.

10.     Venue is proper in this district under 28 U.S.C. § 139l(b) as one or more of the Defendants reside in this district and division and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

11.     FDIC-R's claims are timely brought within four years of the failure of the Bank.  Further, the parties entered into a tolling agreement wherein Defendants, in exchange for valuable consideration, agreed not to assert any defense based on limitations periods in the event that suit was filed prior to March 21, 2014.

### III. THE PARTIES

12.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a).  On March 26, 2010, the Georgia Department of Banking and Finance ("GDBF") appointed the FDIC as Receiver for McIntosh.  12 U.S.C. § 1821(c).  The FDIC-R is acting in its capacity as Receiver and is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles,

powers, and privileges of the Bank and, among others, the depositors, accountholders, and stockholders of the Bank.  In this action, the FDIC-R seeks to recover damages resulting from the tortious conduct of the Defendants.

13.     When McIntosh failed, it had $363.4 million in assets and a loss to the Deposit Insurance Fund currently estimated at $174.4 million.  McIntosh was wholly owned by MCB Financial Group, Inc. ("MFG"), a single-bank holding company, which filed for Chapter 7 bankruptcy protection on March 28, 2010.

14.     Defendant Burson was Chairman of the Board and a member of the Loan Committee from November 5, 2002, until the Bank failed.  Burson is a resident of the State of Georgia residing in Carroll County.

15.     Defendant Alligood was a director and member of the Loan Committee from November 5, 2002, until the Bank failed.  Alligood is a resident of the State of Georgia residing in Carroll County.

16.     Defendant Jordan was a director and a member of the Loan Committee from November 5, 2002, until the Bank failed.  Jordan is a resident of the State of Georgia residing in Carroll County.

17.     Defendant Pitts was a director and a member of the Loan Committee from November 5, 2002, until the Bank failed.  Pitts is a resident of the State of Georgia residing in Carroll County.

18.     Defendant Schoerner was a director and a member of the Loan Committee from November 5, 2002, until the Bank failed.  Schoerner is a resident of the State of Georgia residing in Carroll County.

19.     Defendant Gafford was President, Chief Executive Officer ("CEO"), a director, and a member of the Loan Committee from November 5, 2002, until August 8, 2008.  Gafford filed for Chapter 7 bankruptcy protection on October 20, 2011, and was discharged on September 11, 2012.  Gafford is a nominal defendant only, named solely for the purpose of collecting a debt against a third party, a D&O liability insurer.  Gafford is a resident of the State of Georgia residing in Carroll County.

20.     Defendant Kennedy was Market Chairman and a Commercial Lending Officer ("CLO") from March 15, 2006, until he was terminated on August 11, 2009.  Kennedy is a resident of the State of Georgia residing in Morgan County.

21.     Defendant Teal was Executive Vice President ("EVP"), Senior Lending Officer ("SLO"), and member of the Loan Committee from November 5, 2002, to August 27, 2008, when she became President and CEO, and remained in these positions until the Bank failed.  Teal was also a director from June 11, 2003, until the Bank failed.  Teal is a resident of the State of Alabama, residing in Cleburne County.

22.     During the relevant time, Defendants Burson, Alligood, Jordan, Pitts and Schoerner served as McIntosh directors.  Defendants Gafford and Teal served as directors and as McIntosh officers, and Defendant Kennedy served as an officer of the Bank.

## IV. FACTS

### A.     McIntosh's Growth in CRE and ADC Lending

23.     McIntosh opened for business on November 5, 2002, as a state nonmember bank headquartered in Carrollton, Georgia.

24.     In 2006, the Bank announced a goal to grow rapidly and reach $500 million in assets by the end of 2007 and $1 billion in assets by the end of 2012.  It instituted an aggressive growth strategy centered on high concentrations in CRE lending, with an emphasis on ADC loans. The Bank expanded quickly from 2002 to 2007, opening additional branches in Covington, Rome, Bremen, West Point, and Newnan.

25.     In a CRE loan, a bank takes a security interest in real property used for commercial purposes as an additional source of repayment for a loan related to that property.

26.     Regulators, the real estate industry, and lending institutions recognize that CRE loans have unique risks.  The borrower base includes significant numbers

of project developers, builders, and speculators, often with multiple concurrent projects, whose revenues and costs are subject to fluctuations in real estate values, among other things.

27.    ADC loans are a subset of CRE loans.  In an ADC loan, loan proceeds are used to acquire, develop and/or construct unimproved real property prior to the erection of structures.  ADC loans are even more inherently risky than other CRE loans and more susceptible to fluctuations in real estate values.

28.    The Bank's Loan Policy recognized the unique risks of concentrations in real estate loans.  For example, according to the Policy, "Real Estate lending may present the Bank with numerous opportunities for profit enhancements and relationship building, however, as real estate lenders we must be conscious of the many risks associated with this type lending." The Loan Committee was to meet quarterly to set specific concentration guidelines, depending on local market conditions, trends in each major area of credit within the bank, local economic conditions, deteriorating credits, and possible implications to the bank.

29.    On or about January 13, 2006, the FDIC issued Financial Institution Letter FIL-4-2006, "Commercial Real Estate Lending," announcing proposed guidance by the federal bank and thrift regulatory agencies concerning sound risk management practices for concentrations in CRE lending.  The proposed guidance

became final on December 12, 2006.  *Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580-01 (Dec. 12, 2006) ("CRE Guidance").

30.     As explained in the release, the agencies issued the guidance in light of the increase in the number of banks whose risk management practices were not evolving with growing CRE concentrations. The release noted the existence of "substantial potential risks posed by credit concentrations, especially in sectors such as CRE, which history has shown to have cycles that can, at much lower concentration levels, inflict large losses upon institutions," and that "concentrations in CRE lending coupled with weak loan underwriting and depressed CRE markets have contributed to significant credit losses in the past."

31.     Among other things, the Guidance stated that regulators would consider banks with CRE concentrations exceeding 300 percent of risk-based capital, or ADC concentrations exceeding 100 percent of risk-based capital, potentially exposed to significant CRE concentration risk, thereby warranting heightened risk-management practices.

32.     While not adopting mandatory "limits," the Guidance stressed that "strong risk management practices and appropriate levels of capital are important

elements of a sound CRE lending program, particularly when an institution has a concentration in CRE loans."

33.     The Guidance admonished that the "key elements in establishing a risk management framework that effectively identifies, monitors, and controls CRE concentration risk [include] Board and management oversight; portfolio management; management information systems; credit underwriting standards; portfolio stress testing and sensitivity analysis; [and] credit risk review function."

34.     Notwithstanding promulgation of the CRE Guidance and regulators' direct warnings to the Board as described below, Defendants continued to approve McIntosh's CRE growth and increase its significant overconcentration risk in a way that far surpassed the concentrations in these types of loans at other similarly-sized banks.  In 2006 and 2007, the Bank's ADC loans as a percentage of total capital surpassed its peer group average by a wide margin, and for each quarter of 2007 was greater than three times that of its peer group.

35.     The comparison of these figures based on data in McIntosh's quarterly Consolidated Reports of Condition and Income ("Call Reports") and Uniform Bank Performance Reports ("UBPR") prior to and during the time the Loss Transactions were made is set forth below:

| Uniform Bank Performance Report Date | ADC Loans as % of Total Capital (MCB) | ADC Loans as % of Total Capital (Peer Group) | ADC Percentile as Compared to Peers | CRE Loans as % of Total Capital (MCB) | CRE loans as % of Total Capital (Peer Group) | CRE Percentile as Compared to Peers |
|---|---|---|---|---|---|---|
| Mar. 31, 2006 | 303.93 | 120.89 | 89 | 554.63 | 326.88 | 84 |
| June 30, 2006 | 366.21 | 127.28 | 94 | 587.13 | 339.05 | 90 |
| Sept. 30, 2006 | 378.41 | 132.13 | 94 | 586.12 | 347.33 | 84 |
| Dec. 31, 2006 | 391.80 | 137.70 | 92 | 604.45 | 354.81 | 85 |
| Mar. 31, 2007 | 393.46 | 120.94 | 96 | 589.53 | 373.44 | 89 |
| June 30, 2007 | 419.50 | 122.97 | 97 | 612.05 | 373.61 | 91 |
| Sept. 30, 2007 | 424.26 | 122.63 | 97 | 615.76 | 372.91 | 91 |
| Dec. 31, 2007 | 418.53 | 123.58 | 97 | 604.20 | 377.34 | 89 |

36.    As reflected above, during the March 2006 through June 2007 period in which all of the Loss Transactions were approved, McIntosh's CRE concentrations were consistently more than 180 percent of the regulatory threshold deemed to constitute a significant CRE concentration risk.  Similarly, its ADC concentrations were consistently more three to four times the regulatory threshold for significant ADC concentration risk.  Compared to its peer banks, McIntosh's

CRE concentrations routinely ranked between the mid-80[th] and 90th percentiles and its ADC concentrations consistently ranked in the 90th percentile and higher.

37.   The information set forth in the table above was publicly available and readily accessible to all Defendants, each of whom had a duty to read and review the Bank's Call Reports and UBPRs before approving loans, and to determine the reason for significant variances in the Bank's performance when compared to its peer group.

38.   Although Defendants were aware that the Bank's CRE and ADC concentrations far exceeded the triggers for special attention and were regularly provided with information of key economic indicators, such as trends in the real estate market, Defendants did not adopt limits on CRE loan exposure, develop and implement plans to reduce or mitigate concentration risks, or curb or curtail further CRE lending. Instead, Defendants continued to approve high risk and speculative ADC and CRE loans and loan participations, including the Loss Transactions.

39.   Defendants knew or should have known that concentrating a loan portfolio in ADC/CRE loans substantially increases a bank's risk for numerous reasons, including the well-known principles that: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the real estate and housing markets, in particular, are cyclical by nature; (c) the primary source of repayment for these types of loans is the cash flow from the sale of the real estate

collateral; and (d) historically, bank failure rates closely correlate with high ADC/CRE concentrations. In short, concentrations of ADC/CRE loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices and concentration ratios.

40.     As a result of the unrestrained growth, the Bank's assets (i.e., loans) grew from $223.3 million in 2005 to $406.6 million in 2007 – an increase of 82 percent – with ADC loans reaching 466.4 percent of Tier 1 capital as of June 30, 2007.

**B.     Defendants Ignored Regulator Warnings Regarding Lending Concentrations and Asset Management.**

41.     In October 2005, early in the Bank's growth period, Bank regulators criticized the Bank's significant concentration in ADC loans and high level of dependence on brokered deposits.  In pursuit of accelerated growth, the Bank had departed from fundamentally sound lending practices and made a large number of CRE and ADC loans that violated the Bank's Loan Policy, underwriting requirements, and prudent lending practices.

42.     During this same examination, regulators identified weaknesses in the Bank's underwriting and monitoring of asset-based loans and deficiencies in the Bank's asset and liability management policy.

43.     In an earlier examination from 2004, examiners noted that loan growth continued to exceed core deposit growth, and the Bank needed to reduce the high volatility in the Bank's funding structure.

44.     During the 2006 examination, GDBF examiners criticized the Bank for: (i) increases in adversely classified assets; (ii) anticipated earnings that failed to sufficiently augment capital to support the Bank's planned expansion efforts; (iii) violations of the Loan Policy regarding appraisals; (iv) increased asset sensitivity; and (v) management's failure to verify or back-test the interest rate risk models.

45.     Defendants failed to address the weaknesses identified in the 2004 through 2006 examinations.  Notwithstanding the regulatory criticisms, Defendants approved additional loans: (i) with excessive LTV ratios, if fully funded; (ii) with incomplete or inaccurate borrower financial information; (iii) with missing or inadequate financial project analysis; (iv) with incomplete and inaccurate appraisal information; and (v) that exceeded the Bank's CRE concentration limit of 40 percent of the total loan portfolio.

46.     Defendants also failed to perform adequate or thorough financial analysis on many of the Bank's largest loans and loan participations, thereby escalating the risk that the repayment capacity of borrowers would be insufficient. Defendants failed to obtain current appraisals on numerous properties and approved

renewals of loans despite the fact that inspections were not conducted or were inadequately conducted, which resulted in cost overruns and over-advancement of construction draws, violation of the Loan Policy guidelines, and further deterioration in the quality of the Bank's loan portfolio.

### C.   Loan Regulations and Guidance

47.   The FDIC, as required by 12 U.S.C. § 1831p-1, has established safety and soundness standards which apply to all insured banks.  These standards, Appendix A to 12 C.F.R. Part 364, "*Interagency Guidelines Establishing Standards for Safety and Soundness,*" prescribe operational and managerial standards for, among other things: internal controls; loan documentation; credit underwriting; asset growth; and asset quality.  These standards provide:

(a) as to internal controls, that there is (i) an organizational structure that establishes clear lines of authority and responsibility for monitoring adherence to established policies, (ii) effective risk assessment and (iii) compliance with applicable laws and regulations;

(b) as to loan documentation, that loan documentation practices allow an institution to (i) make informed lending decisions and assess risk as necessary on an ongoing basis, (ii) identify the purpose of a loan and assess the ability of a borrower to repay the indebtedness in a timely

17

manner, and (iii) demonstrate appropriate administration and monitoring of a loan;

(c) as to credit underwriting, that an institution's prudent credit underwriting practices (i) are commensurate with the types of loans the institution will make, (ii) consider the nature of the markets in which loans will be made, (iii) provide for consideration, prior to credit commitment, of the borrower's overall financial conditions and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral and the borrower's character and willingness to repay as agreed, and (iv) take adequate account of concentration of credit risk;

(d) as to asset growth, an institution's asset growth should be prudent and consider any increase in credit risk as a result of growth and the effect of growth on the institution's capital; and

(e) as to asset quality, that an institution maintain a system commensurate with its size and the nature and scope of its operations to identify problem assets and prevent deterioration in those assets, and specifically to estimate the inherent losses in those assets and establish

reserves that are sufficient to absorb estimated losses and consider the size and potential risks of material asset concentrations.

48.     The FDIC, as required by 12 U.S.C. §1828(o), has prescribed standards for real estate lending to be used by insured banks which require insured state banks to adopt and maintain written policies that establish appropriate limits and standards for extensions of credit that are secured by liens on or interests in real estate or that are made for the purpose of financing permanent improvements to real estate.  These policies must establish loan portfolio diversification standards, prudent underwriting standards, including loan-to-value limits that are clear and measurable, loan administration procedures for the bank's real estate portfolio, and documentation, approval, and reporting requirements to monitor compliance with the bank's real estate lending policies.  12 C.F.R. § 365.2.

49.     The *Interagency Guidelines For Real Estate Lending Policies* directs that the institution should consider both internal and external factors in formulating its loan policies, including:

> (a) the size and financial condition of the institution;

> (b) the expertise and size of the lending staff;

> (c) the need to avoid undue concentrations of risk; and

> (d) market conditions.

50.     The *Interagency Guidelines For Real Estate Lending Policies* identify the market supply and demand factors that should be considered, including:

(a)   demographic indicators, including population and employment trends;

(b) current and projected vacancy, construction, and absorption rates; and

(c) economic indicators, including trends and diversification of the lending area.

51.     The *Interagency Guidelines For Real Estate Lending Policies* identify the underwriting standards that should be included in a bank's loan policy, including:

(a) the capacity of the borrower, or income from the underlying property, to adequately service the debt;

(b) the value of the mortgaged property;

(c) the overall creditworthiness of the borrower;

(d) the level of equity invested in the property;

(e) any secondary sources of repayment;

(f) any additional collateral or credit enhancements, such as guarantees;

(g) loan-to-value limits by type of property;

(h) for development and construction projects and completed commercial properties, requirements for feasibility studies;

(i) minimum requirements for initial investment and maintenance of hard equity by the borrower (cash or unencumbered investment in the underlying property);

(j) minimum standards for net worth, cash flow, and debt service coverage of the borrower or underlying property;

(k) standards for the acceptability of and limits on non-amortizing loans;

(l) standards for the acceptability of and limits on the use of interest reserves;

(m) pre-leasing and pre-sale requirements for income-producing property;

(n) pre-sale and minimum unit release requirements for non-income-producing property loans; and

(o) requirements for takeout commitments.

52. The *Interagency Guidelines For Real Estate Lending Policies* define terms for the loans made by Defendants which comprise the Loss Transactions:

(a) *Construction Loan* means an extension of credit for the purpose of erecting or rehabilitating buildings or other structures;

(b) *Land Development Loan* means an extension of credit for the purpose of improving unimproved real property prior to the erection of structures, including the laying or placement of sewers, water pipes, utility cables, streets, and other infrastructure necessary for future development;

(c) *Loan origination* means the time of inception of the obligation to extend credit—when the last event or prerequisite controllable by the lender occurs, causing the lender to become legally bound to fund an extension of credit;

(d) *Loan-to-value* or *loan-to-value ratio* means the percentage or ratio that is derived at the time of loan origination by dividing an extension of credit by the total value of the property(ies) securing or being improved by the extension of credit; and

(e) *Value* means an opinion or estimate, set forth in an appraisal or evaluation, of the market value of real property, prepared in accordance with the FDIC's appraisal regulations and guidelines.

### D.    McIntosh's Loan Policy and Loan Approval Process

53.    The loan approval process is a bank's foremost means to control loan quality and maintain the integrity of a bank's loan portfolio. An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit, collateral, and repayment sources at origination.

54.    McIntosh's Loan Policy dated October 23, 2002, was reviewed and reapproved on March 8, 2006, and amended on September 14, 2006, and December 19, 2007.  The policy provisions relevant to the 12 Loss Transactions were not materially amended and are as follows:

(a) All credit requests required complete documentation prior to approval, including a written application or loan summary memorandum stating the purpose of the request, the source of repayment, the loan amount, the term and any collateral; a current financial statement and income information sufficient to document the source of repayment; tax returns for the previous two years; and background information, a credit report less than 12 months old, financial information, management review and collateral review.

Where a loan relationship exceeded $1 million, lenders needed the most reliable information available and could require audited financial statements and tax returns.

(b) The maximum permissible LTV ratio was 75 percent for land development loans, 80 percent for commercial and residential construction loans, and 65 percent for raw land loans. For purposes of calculating the loan-to-value ratio, an opinion or estimate was required to be set forth in an appraisal or estimate meeting regulatory guidelines.

(c) A land development loan should generally not exceed twelve months but could be extended for another twelve months if market conditions were favorable. The advance rate should not exceed 75 percent LTV or 90 percent of cost, whichever was less.

(d) Commercial construction loans were to mature in twelve months or less, but, if renewed, could not exceed five years from origination without being amortized.

(e) A construction loan must have a defined source of repayment either by a commitment from McIntosh or another financial institution for a permanent takeout.

(f) The number of construction loans for a single builder were to be determined and noted in a file memo in the credit file, and the decision to finance additional loans to such builder should be based, among other things, on overall financial strength, working capital position, ability and market conditions.

(g) Qualified appraisals were to be obtained on real estate loans secured by real estate greater than $250,000, to be supported by an appraisal performed by a qualified appraiser knowledgeable about relevant markets, in conformity with USPAP, and to be "totally independent of the loan function."

(h) The maximum loan-to-one-borrower ("LTOB") limit was 25 percent of the Bank's capital.  From 2006 through 2007, the Bank's total capital ranged from $19.5 million to $33 million.

(i) All loan participations required compliance with McIntosh's Loan Policy as if McIntosh originated the loan itself, including an analysis of collateral quality, and reviews of the sufficiency of the appraisal and the credit file.

(j) Because it was the policy of the Bank to maintain a diverse loan portfolio for the purpose of diversifying the Bank's credit risk, the

Bank's loan portfolio was to be maintained in line with specific category distributions: loans secured by real estate were to constitute no more than 65 percent of the portfolio, with "construction and land development" loans constituting a maximum of 40 percent of these loans. Commercial and industrial loans were limited to 25 percent, and consumer loans and equity loans to 10 percent of the portfolio.

(k) The Bank's geographic trade area was Carroll, Floyd, Haralson, Newton, Rockdale, Coweta, and Troup Counties, in Georgia, but "[l]oans outside of this trade area but within a 50 mile radius are permitted" if exceptions received the prior approval of the President or Executive Vice President. All out-of-area loans required the approval of the Loan Committee.

(l) All loan requests were required "to be reviewed for aggregate outstanding credit of any connection with other borrowers prior to the approval of any new loans."

(m) Interest was required to be collected on all loans when due and could not be capitalized in order to make a loan current. In any circumstance in which the Bank agreed to capitalize a customer's interest, the details were required to be in a memo and submitted for

prior approval by the Executive Vice President and placed in the customer's credit file.

55.     The provisions of the Loan Policy pertaining to real estate lending stated that "prudent lending dictates that the borrower should have some minimum amount of equity regardless of the advance rate," and further provided that the Bank should minimize its risk levels in real estate lending by (a) adhering to appropriate loan-to-value margin requirements; (b) respecting the boundaries of its geographic market; (c) identifying and monitoring exposures in various types of real estate properties, and (d) lending to experienced and proven real estate professionals.

56.     The Loan Committee met weekly to review the Bank's lending activities.  The Loan Committee had authority to approve loans over $500,000 up to the Bank's legal lending limit.  The Georgia legal lending limit for secured loans was 25 percent of the Bank's total capital.

57.     Each of the Loss Transactions required approval by the Loan Committee but did not require full Board approval.  Loans were approved by a majority vote of Loan Committee members present.

### E.     Loan Underwriting Violations and Deficiencies

58.     As detailed herein, substantial losses were sustained by reason of Defendants' negligent and grossly negligent departures from safe and sound banking

practices. Each of the Defendants repeatedly knowingly or negligently disregarded the Bank's Loan Policy and approved loans and loan participations involving: loans which, if fully funded, would have violated the Bank's LTV policies; borrowers who were not creditworthy; projects that provided insufficient collateral and guarantees for repayment; projects in which borrower equity contributions were not verified; and projects that purported to be dependent upon the sale of developed property for repayment of the loan, but which did not extend sufficient funds to finance the anticipated development.

59.     Between at least March 21, 2006, and June 19, 2007, Defendants repeatedly engaged in a pattern and practice of knowingly or negligently approving loans and loan purchases that: 1) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 54, above; 2) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and 3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

**The 12 Loss Transactions**

60.    For each of the Loss Transactions, Defendants were negligent and grossly negligent and breached their fiduciary duties, violating the Bank's Loan Policy, applicable rules and regulations, and prudent banking practices.  Attached to this Complaint as Exhibit A is a chart that identifies the Loss Transactions by borrower, approval date, loan amount, damages relating to the transaction, and the Defendants who approved or recommended the loans.

61.    The information provided to the Loan Committee members in connection with the Loss Transactions, including the loan worksheets or credit memoranda, showed that the proposed loans violated the Bank's Loan Policy, regulatory laws, regulations and standards, and principles of prudent lending, or, alternatively, showed that the information was insufficient to support any informed or reasonable decision to approve the proposed loans.

62.    Each of the Loss Transactions violated the Bank's Loan Policy in numerous respects and illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that resulted in the Bank's catastrophic losses and that constitute negligence, gross negligence and breach of fiduciary duty, either separately or together as a pattern or practice.

## GD Inc.[1]

63.    In March 2006, McIntosh purchased a participation interest of $2.5 million (representing a 27.6 percent participation) in a loan of $9,053,746 made to GD Inc. by First Bank Financial Services (FBFS) (also known as First Bank of Henry County), which subsequently failed.

64.    The Loan Committee, Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal, approved the GD loan on March 21, 2006.  The minutes from March 21, 2006, show that the loan, which was to a new customer of the Bank, was a "verbal request."  The loan review and credit memo initialed by Defendant Teal indicates that approval by the loan committee was also "verbal 3/21/2006".

65.    The purpose of this loan was to refinance two other loans at FBFS (for a combined amount of $3,847,398) and also to fund the development of 191 lots in Henry County, Georgia.

66.    The loan had a term of 24 months, however, the appraisal obtained by FBFS showed a 36-month absorption rate for the sale of the lots after development. Because the loan anticipated sale of the lots as the primary source of repayment, the

---

[1] Borrowers/guarantors are identified in this Complaint by their initials only in order to preserve their right to financial privacy afforded by applicable Georgia and federal banking laws. The Defendants, however, will be provided with the complete names of borrowers/guarantors.

Loan Committee could not reasonably have expected this loan to be repaid within the two-year loan term.

67.     FBFS stated in a memorandum that "the land loan is with us and the borrower injected 10 percent of the land cost at that time."   Although both the participation agreement and McIntosh's Loan Policy required the Bank to perform its own due diligence prior to approving this loan participation, the Bank failed to seek any documentation to confirm the borrower's equity injection.   Although McIntosh had no prior relationship with the borrower or guarantor on this loan, Defendant Gafford claimed to have worked with the guarantor "during the past six years" and vouched for his "quality product" at the meeting.   There is no indication that the Loan Committee undertook other investigation into the borrower/guarantor prior to approving the loan. No detailed global cash flow analysis was performed on the related entities owned or controlled by the guarantor.

68.     The Loan Committee knew at the time of approval that if fully funded, the loan would have a 75% LTV based on the appraisal ordered by FBFS; however, in violation of the Bank's appraisal policy, no appraisal review was performed by the Bank until after the loan was funded, suggesting that the Loan Committee did not receive the full appraisal prior to loan approval.

69.    At the time that they approved the GD loan, Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least the following respects: guarantor/borrower lacked earnings and cash flow to support debt; loan file was missing financial information and/or contained inadequate financial analysis; Bank had not performed its own due diligence as required for purchase of participation loans; Bank failed to obtain an adequate appraisal for the collateral on the loan.

70.    The negligent and/or grossly negligent approval of this loan participation purchase by Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal resulted in substantial damages in an amount to be proved at trial.

## A&A CH, Inc. (1)

71.    On April 7, 2006, McIntosh made four loans as part of a $1.632 million builder's line of credit for another new customer, A&A CH, Inc. ("A&A"), to acquire lots and construct spec homes in a subdivision in Hampton, Henry County, GA.  The first draw on each of these loans, collectively referred to as the A&A (1) loans, was to be used to purchase the lots at $48,500 each, with approximately $112,500 to be used for construction of the houses.

72.   The Loan Committee, Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal, approved the lot loans on April 4, 2006, with Defendant Gafford absent.  Defendant Kennedy made the presentation of the loans to the Loan Committee and recommended the approval of the loans.

73.   The four to five page "summary appraisal reports" for the property to be developed were dated April 4, 2006, the same day the loans were approved.  The appraisals reflected that the cost to construct each house was greater than the remaining amount of each loan once the purchase price for the lot and closing costs were subtracted.

74.   Based upon the appraisals, the Loan Committee knew or should have known that there was an approximate $50,000 shortfall for each of these loans, but the Loan Committee minutes do not reflect any discussion or consideration of the borrower's ability to fund the shortfall during the construction process.  The Loan Committee did not obtain an operating budget or construction cost estimate from the borrower prior to loan approval.

75.   The borrower/guarantor agreed to place approximately $70,000 in a money market account with the Bank in connection with the $1.632 million builder's line of credit, but no money market account was established.  The borrower was not required to contribute any cash equity towards the land purchase, despite the Loan

Policy's provision that "prudent lending dictates that the borrower should have some minimum amount of equity" in the project.

76.     In addition to the foregoing, no cash flow analysis was performed to account for the guarantor's ongoing projects in other subdivisions. A&A was established in September, 2004 and did not have a business history upon which the Bank could rely. The Loan Committee approved the guidance line even though the only financial information it was provided were balance sheets and tax returns prepared by an affiliate of the borrower.

77.     At the time that they recommended or approved the A&A loans, Defendants Kennedy, Alligood, Burson, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loans violated the Bank's Loan Policy in at least the following respects:  guarantor/borrower lacked earnings and cash flow to support debt; loan files were missing financial information and/or contained inadequate financial analysis; and appraisals reflected a shortfall between amount loaned and amount to complete construction of spec homes intended to serve as collateral on loans.

78.     The negligent and/or grossly negligent recommendation of these loans by Defendant Kennedy and negligent and grossly negligent approval of these loans by Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal breached these

Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## A&A CH, Inc. (2)

79.   In addition to the four A&A loans described above, McIntosh later made a loan to A&A for the purchase of a lot and the construction of a spec home in a different development, a subdivision in Greensboro, Greene County, Georgia.

80.   Defendant Kennedy, the loan officer for this loan, presented a construction loan request to the Loan Committee on September 5, 2006. The Loan Committee, Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal, with Defendant Gafford absent, approved the loan in the amount of $472,500.  At closing on September 8, 2006, the initial disbursement on the loan to acquire the property was for the purchase price of the lot, $100,000, plus closing costs.

81.   In recommending this loan, Defendant Kennedy failed to disclose to the Loan Committee that in February, 2005, he had purchased for $25,000 the lot being sold to A&A for $100,000. In violation of the Bank's policy requiring that an appraisal not be ordered by the lending officer originating the loan, Kennedy ordered an appraisal which represented that there had been no prior sales of the subject property in the 36 months preceding the transaction, which Kennedy knew to be false.

82.     The appraisal also relied upon comparables located four to five miles from the subject property in order to justify a final appraised value of $630,000. The original loan amount of $472,500 represented a 75 percent LTV, if fully funded, when compared to the $630,000 fair market value projected by the appraisal.

83.     The first draw from the loan was supposed to be used to purchase the lot at a cost of $100,000, representing 100 percent loan to cost ("LTC") for the lot. After subtracting the cost of lot acquisition and loan closing costs, the available funds for construction of the residence was $366,603; however, according to the appraisal, this amount was $148,532 short of the estimate to construct.  Even using the construction estimate provided by the borrower, the projected shortfall to complete construction was $108,097.  The Loan Committee minutes do not reflect any discussion or consideration of the borrower's ability to fund the shortfall during the construction process.

84.     The Loan Committee failed to analyze cash flow at origination, relied upon a borrower/guarantor net worth that was from illiquid assets, and relied upon collateral-dependent repayment, notwithstanding the fact that insufficient funds were being loaned to complete the project.

85.     At the time that they recommended or approved the A&A (2) loan, Defendants Kennedy, Alligood, Burson, Jordan, Pitts, Schoerner, and Teal knew or

should have known that the loan violated the Bank's Loan Policy in at least the following respects: guarantor/borrower lacked earnings and cash flow to support debt; loan file was missing financial information and/or contained inadequate financial analysis; appraisal reflected a shortfall between amount loaned and amount to complete construction of the spec home intended to serve as collateral on loan.

86.     The negligent and/or grossly negligent recommendation of this loan by Defendant Kennedy and negligent and grossly negligent approval of this loan by Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

### GDGO, LLC

87.     The GDGO loan originated on June 6, 2006, as a loan to a new customer to pay off a loan from another bank for the purpose of purchasing developments, creating lots for sale, and/or spec construction.

88.     Defendant Kennedy recommended this loan, and the Loan Committee, Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal, approved the loan on May 23, 2006.

89.     In violation of the Bank's LTOB limit, the original loan amount at McIntosh was $4,626,412; however, $2.8 million of this loan was participated to Georgia Bank and Trust of Augusta, Georgia, six months after loan origination.

90.     The stated net worth of the individual guarantors from the guarantors' self-prepared financial statements was identified as the primary basis for the extension of credit, but the Loan Committee failed to verify any of the assets or liabilities listed in the guarantors' financial statements prior to loan origination.

91.     The borrower's balance sheet as of December 31, 2005, showed that the borrower had approximately $127,000 in liquid assets and more than $1.8 million in liabilities.  Despite the fact that this was a loan to a new customer with more than 17 related companies referenced in its financials, no comprehensive global cash flow analysis was performed prior to loan origination.

92.     Although the Bank was aware that GDGO had a continuing relationship with the bank that originally financed the land purchase, there is no memorandum in the file addressing that bank's reasons for declining to provide financing for the development project.

93.     At the time that they recommended or approved the GDGO loan, Defendants Kennedy Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least

the following respects:  guarantor/borrower lacked earnings and cash flow to support debt; loan file was missing financial information and/or contained inadequate financial analysis; loan violated the Bank's LTOB limits; Bank failed to obtain an adequate appraisal for the collateral on the loan.

94.     The negligent and/or grossly negligent recommendation of this loan by Defendant Kennedy and negligent and grossly negligent approval of this loan by Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## F & H E, Inc.

95.     On September 12, 2006, Defendant Kennedy recommended and the Loan Committee, Defendants Burson, Gafford, Pitts, Schoerner, and Teal, approved a $2.119 million loan to F&H, a new customer of the Bank, for the purpose of purchasing nine lots in Alpharetta, Georgia, and constructing $1 million "spec" homes for an upscale development.

96.     Of the F&H loan amount, $2.025 million was used to purchase the nine lots, and $91,800 was used to install sewer taps.  On this same date, the Loan Committee approved three additional loans for the development of individual lots, for a total loan relationship of $4.769 million with a customer who had no prior

history with the Bank.  This amount violated the LTOB provisions of the Loan Policy.

97.     In approving these loans, the Loan Committee indicated that appraisals of the property had not yet been obtained, commenting that "the appraisals have been ordered which will give us the absorption information for this area.  We are unable to pull up Fulton County on the metro study, but have consulted a number of experienced real-estate professionals and feel very good about that market."

98.     Despite the fact that these loans were for speculative construction by a new customer in a subdivision more than 50 miles from the Covington, Georgia, branch out of which the loans were made, and apparently lacked appraisals at the time the loans were presented, the Loan Committee unanimously approved the loans.

99.     The appraisal that was eventually obtained based its conclusions on the total value of the nine lots rather than the value of the individual lots, in violation of the Loan Policy requiring "an appraisal for each separate piece of collateral."

100.   The lots for these loans were purchased from a non-arms-length affiliate company of the guarantor, which the guarantors formed at the same time that they formed F&H.  In violation of the Loan Policy requiring that the purpose of the loan be clearly stated in the materials provided to the Loan Committee, there are multiple inconsistencies within the file regarding the price of lots, the items being

financed, and development costs.  The Loan Committee minutes fail to address these inconsistencies.

101.   The estimated LTV ratio for the loans if fully funded, as noted in the loan memorandum, was 93 percent, a violation of the 75 percent ratio limit for development loans in the Loan Policy, and the loan-to-cost ratio was 97.4 percent, in violation of the 90 percent limit in the Loan Policy for development loans.

102.   Neither the borrower nor the guarantors provided financial statements and no global cash flow analysis was performed to determine the borrowers' and guarantors' ability to repay the loans.

103.   The borrowers contributed no equity to the project and the loans provided 102.5 percent financing for land acquisition, despite the Loan Policy's provision that "prudent lending dictates that the borrower should have some minimum amount of equity" in the project.

104.   At the time that they recommended or approved the F&H loans, Defendants Kennedy, Burson, Gafford, Pitts, Schoerner, and Teal knew or should have known that the development loans violated the Bank's Loan Policy in at least the following respects: guarantor/borrower lacked earnings and cash flow to support debt; loan files were missing financial information and/or contained inadequate financial analysis; loans would have violated the Bank's LTV and LTC limits if fully

funded; loans violated the Bank's LTOB limits; appraisal did not meet Loan Policy requirements; borrower did not contribute equity towards project.

105.   The negligent and grossly negligent recommendation of these loans by Defendant Kennedy and negligent and grossly negligent approval of these loans by Defendants Burson, Gafford, Pitts, Schoerner, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## PCR, LLC

106.   On October 9, 2006, the Bank originated the PCR loan in the amount of $2.07 million to purchase and develop 5.265 acres into 42 townhome lots in Gwinnett County, Georgia.

107.   This loan was recommended by Defendant Kennedy and approved by the Loan Committee, Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal on October 3, 2006.

108.   Although Gwinnett County is outside the geographic trade area described in the Loan Policy, the Loan Committee approved this ADC loan prior to receipt of an appraisal.

109.   An internal appraisal review performed prior to the loan closing noted that the appraisal, which reported a prospective market value of $2.762 million,

failed to include a cost approach or a sales comparison approach and lacked information regarding comparable lots and subdivisions.

110.   The Loan Committee approved the loan for 90 percent of the total land and development costs.   However, in violation of the Loan Policy, McIntosh financed more than 100 percent of the purchase price of the land at closing.

111.   The Loan Committee did not require the borrower to make any cash equity contribution towards the project prior to funding the loan and gave cash back to the borrower at the closing on the land purchase.

112.   The loan does not reflect a comprehensive global cash flow analysis on the related entities and debts held by the guarantors, at least one of whom had 26 associated businesses with contingent liabilities, and no outside sources were consulted to confirm the guarantors' reported incomes.

113.   Although one guarantor self-reported a net worth of $35 million, $28.6 million of the value was in "closely held businesses and corporations" rather than cash or other liquid assets. In violation of the Loan Policy requiring "adequate debt service coverage" for real estate loans, a second guarantor had a debt coverage service ratio stated at 0.16 and reported that he had zero income in 2006 as of the time of loan approval.   A third guarantor had a debt coverage service ratio of 0.09.

114.   At the time that they recommended or approved the PCR loan, Defendants Kennedy, Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least the following respects:  guarantor/borrower lacked earnings and cash flow to support debt; loan file contained inadequate financial analysis; and an appraisal had not been obtained to verify the value of the collateral being acquired.

115.   The negligent and/or grossly negligent recommendation of this loan by Defendant Kennedy and negligent and grossly negligent approval of this loan by Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## TH, Inc.

116.   On November 29, 2006, the TH loan originated as a $1.1 million guidance line of credit to a new customer of the Bank, for the purpose of purchasing six lots as "inventory" for building spec homes in Athens-Clarke County, Georgia.

117.   This loan was recommended by Defendant Kennedy and approved by the Loan Committee, Defendants Alligood, Burson, Gafford, Jordan, Pitts, and Teal, on October 3, 2006.  The loan was reapproved on October 31, 2006, with $330,000 for the lot inventory.  Subsequent renewals which consolidated balances on other

lots purchased under the guidance line resulted in a total loan amount of $555,669.45 as of July 8, 2008.

118.   At the time he recommended the loan, Defendant Kennedy represented to the Loan Committee that the LTV ratio on the builder's guidance line was not to exceed 75 percent of the appraised value of proposed real estate and not to exceed 90 percent of the cost on the lot loan.  However, the loan was permitted to close without requiring the borrower to contribute cash equity towards any of the lot purchases.  Consequently, once funded, the loan had a LTV ratio of 100 percent, in violation of the Bank's Loan Policy.

119.   One appraisal was used as the basis for establishing the value for each of the six lots, in violation of the Loan Policy, and this appraisal did not include any pictures of the comparables purportedly used to establish the lot value.

120.   The available funding for actual construction of a residence was approximately $131,167, however, the average cost of construction was estimated by the appraiser to be $206,000, not including the lot cost.  The Loan Committee minutes do not reflect any discussion or consideration of the borrower's ability to fund the shortfall during the construction process, which would further impact the borrower's ability to repay the loan.

121.   At the time that they recommended or approved the TH, Inc. loan, Defendants Kennedy, Alligood, Burson, Gafford, Jordan, Pitts, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least the following respects:  guarantor/borrower lacked earnings and cash flow to support debt; financial analysis did not consider borrower and guarantor contingent liabilities; loan violated the Bank's LTV limits once funded; loan lacked adequate appraisals; failure to consider documentation reflecting a shortfall between amount loaned and amount to complete development.

122.   The negligent and/or grossly negligent recommendation of this loan by Defendant Kennedy and negligent and grossly negligent approval of this loan by Defendants Alligood, Burson, Gafford, Jordan, Pitts, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## CRM D, LLC

123.   The CRM loan originated on March 7, 2007, as a $4,557,600 loan for the acquisition and development of 39 residential lots in Forsyth County, Georgia, which was outside the geographic trade area of the Bank and more than 50 miles from the Covington, Georgia, branch out of which the loan was made.

124.   Defendant Kennedy recommended the loan and the Loan Committee, Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal, approved the loan on February 27, 2007.

125.   At the time the loan was presented, the borrower indicated that it had secured a contract for the sale of the property after development.  The Loan Committee did not require any documentation to support the assertion that the lots were under contract.

126.   The Loan Committee agreed to accept two other parcels of land as additional collateral in order to meet the 90 percent LTC requirement for the loan, but failed to require an independent appraisal of the value of those parcels.

127.   Financial information received from the guarantor for this loan did not provide sufficient information upon which to base an expectation of continuing income and failed to explain the reasons for the guarantor's significant losses in the prior tax period. In violation of the Loan Policy, the Loan Committee required no information regarding 9 of the 23 companies in which the guarantor was a principal.

128.   The Loan Committee approved the loan despite a calculated debt service coverage ratio of 0.18, in violation of Loan Policy guidelines requiring "adequate debt service coverage."

129.   The construction project cost breakdown presented at the time of the loan application projected total costs at $5,046,554, almost half a million dollars more than the actual loan amount.  The Loan Committee did not explain how it expected the project to be completed in light of the shortfall in financing.

130.   When the property was appraised on February 22, 2007, its appraised value was $6.388 million, representing a 75 percent LTV ratio and a 90 percent LTC ratio if fully funded.  However, an appraisal review dated March 4, 2007, three days prior to the loan closing, opined that the original appraisal did not conform to USPAP standards and recommended return of the appraisal because the market value of the proposed lots was not supported.

131.   At or around the time the Loan Committee approved the CRM loan, the Bank retained the same appraiser to provide an appraisal of property for another A&D loan request by this same borrower.  That appraisal, dated January 28, 2007, provided an "Atlanta Regional Overview" identical to that included in the February appraisal, but also referenced the "poor real estate housing market for most of the metro Atlanta area."  In violation of the real estate lending provisions of the Loan Policy, the Loan Committee failed to consider these market conditions when approving the CRM loan.

132.   At the time that they recommended or approved the CRM loan, Defendants Kennedy, Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least the following respects:  failure to recognize borrower weaknesses with regard to financial stability and ability for repayment; collateral-dependent repayment; failure to require equity participation by the borrowers; high LTV ratio if fully funded; extension of credit with known deficiencies in the appraisal reports; failure to consider documentation reflecting a shortfall between amount loaned and amount to complete development; and failure to recognize an impaired collateral position.

133.   The negligent and/or grossly negligent recommendation of this loan by Defendant Kennedy and negligent and/or grossly negligent approval of this loan by Defendants Alligood, Burson, Gafford, Jordan, Pitts, Schoerner, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## LH D Co., Inc.

134.   The LH loan originated on March 30, 2007, as a $4.8 million loan for the acquisition and development of a 31.55 acre parcel which was to be developed into 88 residential building lots in Paulding County, Georgia.  The loan amount was modified to $4.6 million on April 24, 2007.

135.   The Loan Committee, Defendants Alligood, Gafford, Jordan, Pitts, Schoerner, and Teal, approved the loan on March 27, 2007.

136.   The Bank funded the loan with the assumption that the value of the land was $2.550 million, but materials in the loan file showed that the land previously sold for $2.016 million in an arms-length sales transaction three months prior to the Bank's approval of this loan.

137.   At the time that this loan was approved, the Loan Committee relied upon a 2005 tax return for the guarantor.  When the guarantor's 2006 tax return was provided to the Bank, approximately one year following loan approval, that return reflected a negative adjusted gross income.

138.   Under the considerations for safe, sound and prudent banking, an interim statement on associated businesses for the guarantor should have been requested at loan origination to allow analysis of the guarantor's cash flow for the subject loan and other personal and business debt and the Loan Committee should have required the guarantor to provide his 2006 tax return in advance of loan approval.

139.   Had the Loan Committee required current financials before it approved the loan, it would have known that the guarantor did not have the financial capability to support the 18-month land development project.

140.   A Preliminary Construction Budget prepared on December 18, 2006, and revised March 15, 2007, projected a $235,846 shortfall of funds, based on the original loan amount. The Loan Committee minutes do not reflect any discussion or consideration of the borrower's ability to fund the shortfall during the construction process.

141.   Although the March 20, 2007, credit memorandum for this loan identified the market slowdowns in the residential real estate market as a weakness of this loan, the slowing real estate market was not referenced in the Loan Committee minutes approving the loan.

142.   At the time that they approved the LH loan, Defendants Alligood, Gafford, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least the following respects: guarantor/borrower lacked earnings and cash flow to support debt; loan file was missing current financial information for guarantor; loan file contained inadequate financial analysis; loan would have violated the Bank's LTV limits if fully funded; loan lacked adequate appraisals; failure to consider documentation reflecting a shortfall between amount loaned and amount to complete development.

143.   The negligent and/or grossly negligent approval of this loan by Defendants Alligood, Gafford, Jordan, Pitts, Schoerner, and Teal breached these

Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## R D, LLC

144.   The R D loan was a participation by McIntosh to a new customer in the amount of $1.5 million, which represented 66 percent of the total loan amount.  The primary bank on this loan was First Bank Financial Services (FBFS) (also known as First Bank of Henry County), which subsequently failed.  The purpose of the loan was to purchase and develop 25.58 acres into 88 single family residence townhome and condominium lots, in Union City, Fulton County.

145.   This loan was originated on June 18, 2007, but was not approved by the Loan Committee, Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal, until the following day, June 19, 2007.

146.   The Loan Committee minutes from June 19, 2007, indicate that the term of the request was to be changed "from 365 days to four months;" however, both the note to FBFS and the participation agreement contain a one year term.

147.   The Loan Committee could not have reasonably expected this loan to be repaid within 120 days (or even 365 days) in light of the appraisal, which estimated 24 months for the developed lots to be fully absorbed

148.  The Loan Committee minutes acknowledge that the sole guarantor/principal on this $1.5 million loan also had a low beacon score (621) "due to the amount of inquiries and slow pays."  The Loan Committee received other information from FBFS indicating that this guarantor was only 30 years old.

149.  The financial statement provided by the guarantor was insufficient to substantiate a claim of income from a company that had been in business for less than two full years, and even though the Bank had no prior relationship with the guarantor, no global cash flow analysis was performed on his associated business ventures in order to determine his ability to repay.

150.  Although the appraisal report prepared for FBFS showed that a member of the board of directors at FBFS was a previous owner of the property to be developed, the Loan Committee failed to address this potential conflict of interest by FBFS when it agreed to purchase a participation in this loan.

151.  The loan closing settlement statement, which would have been available for the Loan Committee's review at the time it approved the loan, showed that the selling entity shared an office address with the borrower, yet the Loan Committee failed to inquire as to the relationship between the borrower and seller prior to approving the participation.

152.   At the time this loan was approved in June 2007, the Loan Committee was aware that the metro Atlanta residential real estate market was slowing, but it nonetheless approved this loan for development of 88 condominium and townhome lots in the suburbs of metro Atlanta.

153.   At the time that they approved the R D loan, Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal knew or should have known that the loan violated the Bank's Loan Policy in at least the following respects: guarantor/borrower lacked earnings and cash flow to support debt; loan file contained incomplete financial information and inadequate financial analysis; a complete appraisal had not been obtained or reviewed; participation was purchased without due diligence.

154.   The negligent and/or grossly negligent approval of this loan by Defendants Alligood, Burson, Jordan, Pitts, Schoerner, and Teal breached these Defendants' fiduciary duties to the Bank and resulted in substantial damages in an amount to be proved at trial.

## V. CAUSES OF ACTION

### Count 1-Ordinary Negligence Under Georgia Law Against All Defendants

155.   The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

156.   Defendants, as officers and/or directors of the Bank, each owed the Bank a duty of care under common law and O.C.G.A. §§ 7-1-490, 51-1-2, among other laws and regulations, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management and conduct of McIntosh's business and financial affairs, including its lending practices. Also, each Defendant agreed and was obligated by statute, contract, and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that their actions were in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank. Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

157.   Defendants are not entitled to the application of the business judgment rule because none of the Defendants' actions or inactions, which are the basis of this negligence claim, was taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulators' warnings regarding loan underwriting and risk management deficiencies (¶¶ 41-46), repeatedly approved loans in violation of the Loan Policy and Parts 364

and 365 of the FDIC's Rules and Regulations (¶¶ 47-59), and exposed the Bank to undue risk by overconcentrating in ADC/CRE loans and purchasing participations without adequate risk management controls, despite repeated regulator warnings related thereto (¶¶ 24-40).

158.   Defendant Burson, as Chairman of the Board, and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process, and loan and credit administration practices; complying with banking statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Burson had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

159.   Notwithstanding these duties, Defendant Burson approved 11 of the 12 Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

160.   Defendant Gafford, as CEO of the Bank, Director, and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process, and loan and credit administration practices; complying with banking statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Gafford had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

161.   Notwithstanding these duties, Defendant Gafford approved 9 of the 12 Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

162.   Defendant Alligood, as a Director and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like

positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process, and loan and credit administration practices; complying with banking statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Alligood had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

163.   Notwithstanding these duties, Defendant Alligood approved 9 of the 12 Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

164.   Defendant Jordan, as a Director and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process and loan and credit administration practices; complying with banking

statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Jordan had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

165. Notwithstanding these duties, Defendant Jordan approved 9 of the 12 Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

166. Defendant Pitts, as a Director and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process, and loan and credit administration practices; complying with banking statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Pitts had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

167.   Notwithstanding these duties, Defendant Pitts approved all 12 of the Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

168.   Defendant Schoerner, as a Director and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business. These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process, and loan and credit administration practices; complying with banking statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Schoerner had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

169.   Notwithstanding these duties, Defendant Schoerner approved 11 of the 12 Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

170.   Defendant Teal, as Senior Commercial Lender, Director, and member of the Loan Committee, among other duties, was responsible for oversight of ADC/CRE lending.   These duties included, but were not limited to: lending; adhering to the Bank's ADC/CRE lending and credit policies, loan approval process, and loan and credit administration practices; complying with banking statutes/regulations related to ADC/CRE lending; and not making imprudent loans. Further, as a member of the Loan Committee, Teal had the duty to ensure that she only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

171.   Notwithstanding these duties, Defendant Teal approved all 12 of the Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

172.   Defendant Kennedy, as market chairman for the Covington Branch and a commercial lending officer, among other duties, was responsible for making loans as directed by the Senior Commercial Lender and under the guidelines of the Bank's Loan Policy.

173.   Defendant Kennedy's specific duties included, but were not limited to, understanding and familiarizing himself with the Bank's Loan Policy in order to adequately analyze a potential borrower's ability to repay what it borrowed from the

Bank; properly documenting and underwriting each loan; perfecting the Bank's security interest in any collateral taken; properly grading each credit at its inception and monitoring the credit for grade changes; ensuring that any exceptions to the Loan Policy were brought to the attention of the Loan Committee; not making imprudent loans and extensions of credit; adhering to the Bank's ADC/CRE lending policies, procedures, and controls; complying with the Loan Policy and banking laws and regulations; and conducting ADC/CRE lending in a prudent and sound manner.

174.   Defendant Kennedy owed the Bank the obligation to exercise the degree of diligence, care, and skill that an ordinarily prudent person in like position would exercise under similar circumstances in the management and conduct of the Bank's business and financial affairs, including its lending practices.

175.   Notwithstanding these duties, Defendant Kennedy recommended 9 of the 12 Loss Transactions discussed herein, which violated the written Loan Policy of the Bank as detailed in paragraphs 60-154 of this Complaint.

176.   In addition to the duties set forth in paragraphs 156-175 above, as Directors of the Bank, Defendants Alligood, Burson, Gafford, Jordan, Pitts, and Schoerner, and Teal had the duty under Georgia law to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting, and credit administration practices were followed; to take reasonably prudent steps to ensure that the Bank did

not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank; and to exercise ordinary care and diligence in the administration of the affairs of the Bank, including, but not limited to, the following:

(a) Informing themselves about proposed loans and loan participations and the risks the loans and loan participations posed to the Bank before they approved them;

(b) Exercising independent judgment in connection with the review and approval or disapproval of loans;

(c) Confirming that any loans they approved were underwritten in a safe and sound manner;

(d) Ensuring that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

(e) Not approving loans that exceeded the Bank's relevant concentration limits;

(f) Ensuring that the Bank had adequate capital and other safeguards in place to mitigate the risk of loss from the high concentration of ADC/CRE loans; and

(g) Ensuring that any loans approved did not violate applicable banking regulations.

177.   By their common actions and inactions, as described specifically and generally herein, Defendants Alligood, Burson, Gafford, Jordan, Pitts, and Schoerner, and Teal, as directors of the Bank and members of the Loan Committee, collectively failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

(a) Pursuing an aggressive ADC/CRE lending stratagem that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

(b) Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes, and regulations, and prudent and sound lending practices;

(c) Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags," with respect to the Bank's ADC/CRE lending;

(d) Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

(e) Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

(f) Failing to ensure that ADC/CRE loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(g) Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(h) Failing to ensure that the credit transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

(i) Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

(j) Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

(k) Failing to implement and monitor prudent risk management strategies;

(l) Failing to properly oversee the Bank's loan operations; and

(m) Approving loans which violated the Bank's Loan Policy and sound and prudent underwriting standards.

178.   By their common actions and inactions, as described specifically and generally herein, Defendants Gafford, Teal, and Kennedy, as officers of the Bank, collectively failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

(a) Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(b) Recommending loans despite knowledge of deficiencies in underwriting and loan support, as exhibited by the Loss Transactions;

(c) Failing to implement and follow sound loan underwriting and credit administration practices;

(d) Failing to ensure that the loans recommended to the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(e) Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(f) Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss; and

(g) Recommending loans which violated the Bank's Loan Policy and sound and prudent underwriting standards.

179.   By way of example and not of limitation, and as described above, Defendants failed to adhere to lending policies, applicable requirements, and sound lending practices and thus knew or, in the exercise of reasonable diligence, should have known that their practices were improper, imprudent, and harmful to the Bank.

180.   As a direct and proximate result of the negligent acts and omissions of each Defendant, including their lack of good faith and abuse of discretion, the FDIC-R has suffered Damages in an amount to be proven at trial.

## Count 2- Gross Negligence Under 12 U.S.C. § 1821 (K) And/Or Georgia Law Against All Defendants

181.   The FDIC incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

182.   Section 1821 (k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 182l(k), provides that directors and

officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

183.   In the alternative, the acts or omissions of each of the Defendants, described particularly in paragraphs 156-175 of this Complaint, and especially for damages occurring after the Defendants were warned by regulators, as set forth in paragraphs 24-46, of overconcentration of ADC and CRE loans and deficiencies in loan underwriting and credit administration, which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

184.   Each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

a. Defendant Burson by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings (¶¶ 24-46);

approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); approving loan and loan participation transactions that failed to comply with the Bank's policy and safe and sound lending practices (¶¶ 60-154); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

b. Defendant Gafford by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

c. Defendant Alligood by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to

the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

d. Defendant Jordan by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

e. Defendant Pitts by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

f. Defendant Schoerner by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative

ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

g. Defendant Teal by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

h. Each Defendant who served as a Director and member of the Loan Committee by, among other things, engaging in a common pattern and practice of collectively failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings; approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices; and allowing the Bank's loan portfolio to be

overconcentrated in speculative ADC/CRE loans, thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio.

i. Defendant Kennedy by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 60-154); disregarding regulators' warnings (¶¶ 24-46); recommending high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶ 38); and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans and thereby harming McIntosh's earnings, liquidity, and capital-to-asset ratio (¶¶ 24-46).

185.   As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, the FDIC-R has suffered Damages in an amount to be proven at trial.

## Count 3- Breach of Fiduciary Duty Against All Defendants

186.   The FDIC incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

187.   As Directors and Officers of the Bank, the Defendants occupied a fiduciary relationship with the Bank and owed the Bank a duty to act with the utmost good faith, honesty, and loyalty in the management and conduct of the Bank's business, property and financial affairs.

188.   By their actions and inactions as described in this Complaint, the Defendants failed and neglected to fulfill their respective fiduciary duties to the Bank. Defendants allowed the Bank's assets to be wasted by approving or recommending the Loss Transactions without adherence to the Bank's Loan Policy and prudent lending practices, among other things.

189.   In the alternative to Counts 2 and 3 in this Complaint, the acts and omissions of each Defendant, described herein and particularly in paragraphs 60-154 of this Complaint, constitute breaches of their fiduciary duties to the Bank. As a direct and proximate result of the Defendants' breaches of their fiduciary duty to the Bank, the FDIC-R suffered damages in an amount to be determined at trial.

## VI. DEMAND FOR TRIAL BY JURY

The FDIC-R demands a trial by jury on all issues.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Federal Deposit Insurance Corporation as Receiver for McIntosh Commercial Bank requests entry of judgment in its favor against Defendants as follows:

1. For compensatory damages and other damages, in an amount to be proved at trial;

2. For its costs of suit against all Defendants; and

3. Such other and further relief as the Court deems just and proper.

Respectfully submitted, this 14th day of March, 2014.

**SHINGLER LEWIS LLC**

/s/ Joyce Gist Lewis
Joyce Gist Lewis
Georgia Bar No. 296261
George P. Shingler
Georgia Bar No. 642850
Ashley E. Wilson
Georgia Bar No. 771512
**Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for McIntosh Commercial Bank**

1230 Peachtree Street, Suite 1075
Atlanta, Georgia 30309
Phone: (404) 907-1999
jlewis@shinglerlewis.com
gshingler@shinglerlewis.com
awilson@shinglerlewis.com

**Exhibit A**

**Loss Transactions**

| Borrower | Amount ($millions) | Approval Date | Loss ($millions) | Approval Votes | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Alligood | Burson | Gafford | Jordan | Kennedy | Pitts | Schoerner | Teal |
| 1. GD, Inc. | $2.500 | Mar. 21, 2006 | $1.439 | x | x | x | x | | x | x | x |
| 2. A&A C H (1) | $0.688 | April 4, 2006 | $0.201 | x | x | a | x | r | x | x | x |
| 3. A&A C H (2) | $0.472 | Sept. 8, 2006 | $0.039 | x | x | a | x | r | x | x | x |
| 4. GDGO | $4.400 | May 23, 2006 | $1.119 | x | x | x | x | r | x | x | x |
| 5. F & H | $2.119 | Sep. 12, 2006 | $1.114 | a | x | x | a | r | x | x | x |
| 6. F & H | $1.780 | Sep. 12, 2006 | $0.352 | a | x | x | a | r | x | x | x |
| 7. F & H | $0.870 | Sep. 12, 2006 | $0.202 | a | x | x | a | r | x | x | x |
| 8. TH | $0.550 | Oct. 3, 2006 | $0.238 | x | x | x | x | r | x | a | x |
| 9. PCR | $2.000 | Oct. 17, 2006 | $1.543 | x | x | x | x | r | x | x | x |
| 10. CRM | $5.000 | Feb. 27, 2007 | $1.797 | x | x | x | x | r | x | x | x |
| 11. LH D | $4.600 | Mar. 27, 2007 | $3.528 | x | a | x | x | | x | x | x |
| 12. R D | $1.500 | June 19, 2007 | $0.456 | x | x | a | x | | x | x | x |
| **TOTAL** | **$27.719** | | **$12.028** | | | | | | | | |